UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES DEAN KENDRICK,**<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>**FEDERAL BUREAU OF INVESTIGATION,**<br><br>　　　　　　Defendant. | Case No. 20-cv-2900 (TNM) |

## MEMORANDUM OPINION

James Dean Kendrick submitted a FOIA request to the Federal Bureau of Investigation for records about a prior investigation of him. The agency searched for responsive records, released 147 pages to Kendrick, and withheld 46 pages under various FOIA exemptions. Dissatisfied with that response, Kendrick sued.

Both parties now move for summary judgment. The Court holds that, on this record, the FBI has satisfied its disclosure obligations by conducting adequate searches and releasing all nonexempt information. The Court will therefore grant the FBI's motion and deny Kendrick's motion.

I.

This FOIA case begins with a criminal conviction. In 2016, a federal court sentenced Kendrick to "life imprisonment plus 30 years" for his involvement in a drug ring. ECF No. 937, *United States v. Kendrick, et al.*, No. 6:10-cr-6096 (W.D.N.Y.). To substantiate alleged prosecutorial errors related to his conviction, Kendrick submitted a FOIA request to the FBI. *See* Compl. at 1-2, ECF No. 1. He sought all records (1) pertaining to investigations of him, (2) copies of FBI access logs that federal agents and prosecutors use to retrieve information about

suspects, and (3) documents listing the disposition of the case or investigation, as well as information about why the case was dismissed or the government declined to prosecute. *See* Decl. of Michael G. Seidel (Seidel Decl.) ¶ 5, ECF No. 32-3.

In response, the FBI released 147 responsive pages to Kendrick and withheld 46 pages. *See id*. ¶ 14. The FBI withheld information under FOIA Exemptions 6, 7(C), 7(D) and 7(E), *see* 5 U.S.C. § 552(b), and Privacy Act Exemption (j)(2), *see* 5 U.S.C. § 552a. *See id*. Kendrick appealed to the Office of Information Policy (OIP), which construed his appeal as a request for an itemized index, *see Vaughn v. Rosen,* 484 F.2d 820, 827–28 (D.C. Cir. 1973), and denied it as unmerited "at the administrative stage of a FOIA request." Seidel Decl. ¶¶ 16, 21.

Dissatisfied with the agency's response, Kendrick filed this suit, pro se, arguing that he has a right to the information that the FBI withheld. *See generally* Compl. In response, the FBI conducted another search for responsive records and processed additional pages. *See id*. ¶¶ 22–23 & n.4. In total, the FBI processed 1,044 pages of responsive records, released 76 unredacted pages and 300 redacted pages, and withheld 668 pages. Seidel Decl. ¶ 4. It withheld information under Exemptions 6, 7(C), 7(D) and 7(E), and Privacy Act Exemption (j)(2) or "because the pages were found to be duplicative of other pages accounted for elsewhere in the FBI's production." *Id*.

The FBI moved for summary judgment, *see* Def.'s MSJ, ECF No. 32, and Kendrick filed a combined opposition and cross-motion for the same, *see* Pl.'s MSJ, ECF No. 38. The cross-motions are now ripe for decision. The Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## II.

To prevail on a motion for summary judgment, a party must show that "there is no

genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  FOIA requires "disclosure of documents held by a federal agency unless the documents fall within one of nine enumerated exemptions[.]" *U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).  To obtain summary judgment, the agency bears the burden to show that any claimed exemptions apply.  *See ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011).  This burden does not shift even when the requester cross-moves for summary judgment.  *See Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017).

Courts construe FOIA exemptions narrowly, *see Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011), and considers their applicability de novo, *see King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987).

To meet its burden, an agency may rely on declarations describing the applicability of a FOIA exemption to information that the agency has withheld.  *See Shapiro v. DOJ*, 893 F.3d 796, 799 (D.C. Cir. 2018).  Such declarations receive "a presumption of good faith." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  The Court may grant summary judgment based solely on the agency's declarations if neither record evidence nor evidence of the agency's bad faith contradicts them.  *See Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017). Most FOIA cases resolve at the summary judgment stage.  *See AARC v. CIA*, 317 F. Supp. 3d 394, 399 (D.D.C. 2018), *aff'd*, 781 Fed. App'x 11 (D.C. Cir. 2019) (per curiam).

Because Kendrick proceeds pro se, the Court "liberally construe[s]" his filings.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  That accommodation does not, however, allow him "to ignore the Federal Rules of Civil Procedure." *Oviedo v. WMATA*, 948 F.3d 386, 397 (D.C. Cir. 2020); *see also Raven v. Sajet*, 334 F. Supp. 3d 22, 28 (D.D.C. 2018) (noting that for pro se plaintiffs, "the ultimate standard remains the same"), *aff'd,* 2019 WL 2562945 (D.C. Cir. May

17, 2019) (per curiam). Kendrick still must show that a genuine issue of material fact exists as to whether the agency has inappropriately withheld records. *See* Fed. R. Civ. P. 56(a).

### III.

Kendrick challenges the adequacy of the FBI's searches and its invocation of claimed FOIA exemptions. *See generally* Pl.'s Opp'n and Cross-Mot. for Summ. J. (Pl.'s Opp'n), ECF No. 38. The Court first analyzes the searches and then the exemptions.

### A.

Kendrick questions six categories of documents he believes are missing from the FBI's record production. *See* Pl.'s Opp'n at 4–5.[1] He posits that the FBI's failure to release these documents and to list them in the *Vaughn* Index is proof of an inadequate search. *See id.* But the adequacy of a search "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315–16 (D.C. Cir. 2003). So the key question "is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *SafeCard Servs.*, 926 F.2d at 1201.

Reasonableness "depends . . . upon the facts of each case.'" *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). The agency may prove the reasonableness of its search through "a reasonably detailed affidavit setting forth the search terms and the type of search performed." *Iturralde*, 315 F.3d at 313–14. Once the agency has done so, the plaintiff must produce "countervailing evidence" showing a genuine dispute of material fact about the search's adequacy. *Id*. An agency's declaration that describes the search in reasonable detail and shows

---

[1] All page citations refer to the page numbers generated by the Court's CM/ECF system.

"that all files likely to contain responsive materials (if such records exist) were searched" suffices. *Mobley v. CIA*, 806 F.3d 568, 581 (D.C. Cir. 2015) (cleaned up). And courts afford agency declarations "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id.*

The FBI has carried its burden. Its experienced declarant first explains the FBI's various record-keeping systems. Seidel Decl. ¶ 26.[2] Crucial is the "extensive" Central Records System (CRS) that "spans the entire FBI organization and encompasses the records of FBI Headquarters, FBI field offices, and FBI legal attaché offices worldwide," including investigative and intelligence files. *Id.* The CRS "is where the FBI indexes information about individuals, organizations, events, and other subjects of investigative interest for future retrieval." *Id.* ¶ 43. The declarant also describes how the FBI's subsidiary systems function as indices of individual cases, and how the FBI has digitized and merged these systems over time to preserve records. *See id.* ¶¶ 30–35. He also explains that some of the FBI's records remain preserved in "manual indices," or hard copy records, at the FBI's headquarters and various field offices. *See id.* ¶¶ 36–39.

The declarant attests that the FBI "conducted a search reasonably calculated to locate

---

[2] The FBI's declarant is the Section Chief of the FBI's Record/Information Dissemination Section. Seidel Decl. ¶ 1. The declarant's statements incorporate his personal knowledge acquired as part of his official duties. *See id.* ¶ 2. He supervises hundreds of employees and contractors "whose collective mission is to effectively plan, develop, direct, and manage responses" to FOIA and Privacy Act requests submitted to the FBI. *Id.* ¶¶ 1–2. So the declarant is familiar with the procedures for responding to requests, and he is "[s]pecifically . . . aware of the FBI's handling of Plaintiff's FOIPA request for records related to James Dean Kendrick." *Id.* ¶ 3.

records responsive to [Kendrick's] request." *Id.* ¶ 43.  The FBI queried CRS using the search terms: "Kendrick, James Dean," "Kendrick, James D," and "Kendrick, James," and the nickname located within the search, "Boobie."  *Id.* ¶ 42.  The FBI searched its CRS system because "given [that] Plaintiff's request seeks information about himself, such information would reasonably be expected to be located in the CRS."  *Id.* ¶ 43.  The FBI also searched through manual indices at its headquarters and Buffalo field offices.  *See id.* ¶ 42.  And the FBI identified potentially responsive records through its searches, including "eight files, subfiles, and serials."  *See id.* ¶¶ 40 n.8, 42.

Kendrick's speculation about potentially responsive records in an unconfirmed database, *see* Pl.'s Opp'n at 17, does not cast doubt on the FBI's otherwise thorough searches.  Kendrick claims that during this litigation, he "learned that VICAP is the name of the FBI's National Database, which agents access, in order to retrieve information about individuals that are the target of an investigation."  Pl.'s Opp'n at 17.  Thus, he submitted a new FOIA request in November 2020 asking for records in the VICAP database pertaining to himself.  *See id.*  So Kendrick concludes that the FBI's "complete failure to search for the . . . VICAP access logs qualifies as an unreasonable search for responsive records."  *Id.* at 19.

But the November 2020 FOIA request is beyond the scope of this litigation, and when, as here, the "request does not specify the locations in which an agency should search, the agency has discretion to confine its inquiry to a central filing system."  *Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998) (quoting *Oglesby v. U.S. Dep't of the Navy*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  In other words, the FBI need not search every records system so long as it adequately searches its central filing system—an obligation the FBI satisfied here.  *See id.*  The Court will therefore grant summary judgment to the FBI as to the adequacy of its searches.

**B.**

The Court next assesses whether the FBI properly asserted various FOIA exemptions. Recall that the FBI withheld information under FOIA Exemptions 6, 7(C), 7(D), and 7(E). *See* Seidel Decl. ¶ 49 (summarizing the FBI's claimed exemptions). The FBI must show both that a particular exemption applies, and that foreseeable harm exists from disclosing any withheld information. *See Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021) (citing 5 U.S.C. § 552(a)(8)(A)(i)(I)). Agencies must articulate this foreseeable harm in a "focused and concrete" way. *Id*.

But even without a sufficient explanation from the agency, the "context and purpose" of withheld information can support a finding of foreseeable harm. *Id*. at 372. And as this Court has explained, agencies can more easily meet their foreseeable harm burden when invoking exemptions "for which the risk of harm through disclosure is more self-evident." *Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021). Finally, the FBI must also show that it released all reasonably segregable materials. *See, e.g.*, *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002). With these principles in mind, the Court addresses the FBI's claimed exemptions.

**1.**

The FBI invokes Exemptions 6 and 7(C), both of which permit an agency to withhold information if its disclosure would harm personal privacy. *See Reps. Comm. v. CBP*, 567 F. Supp. 3d at 125. Though the two exemptions are similar, 7(C) "provides broader privacy protections" and "thus establishes a lower bar for withholding material." *CREW v. DOJ*, 854 F.3d 675, 681 (D.C. Cir. 2017). So when agencies rely on both Exemptions 6 and 7(C) for the same material, the Court need not "consider Exemption 6 separately[.]" *Roth v. DOJ*, 642 F.3d

7

1161, 1173 (D.C. Cir. 2011).  Here, the FBI always invokes the two exemptions in tandem.  *See* Seidel Decl. ¶¶ 49, 55–65.  The Court thus considers only Exemption 7(C).

Exemption 7(C) protects from disclosure law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C); *see also Shapiro*, 893 F.3d at 800.  "To determine whether an invasion of privacy is 'unwarranted,' courts balance the privacy interest against the public interest in disclosure, including any potential interest in airing governmental misconduct."  *Prot. Demo'cy Project, Inc. v. NSA*, 10 F.4th 879, 889 (D.C. Cir. 2021).

The FBI attests that some records Kendrick requested resulted from the "fulfillment of its law enforcement duties" and were "compiled in the course of the FBI assisting with a federal joint investigation" of Kendrick and others for conspiring to commit drug trafficking crimes, firearms offenses, and murders.  Seidel Decl. ¶ 45.  Kendrick does not say otherwise, so the Court considers only whether the information meets the conditions of Exemption 7's subparts.  *See ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011).

The FBI redacted the names and other identifying information of third-party individuals—including special agents, professional staff, non-FBI law enforcement personnel, persons of investigative interest, informants, and victims.  *See* Seidel Decl. ¶ 49.  And the FBI plausibly explained the risks to privacy if it were to release such information.  *See id.* ¶¶ 55–65.  The D.C. Circuit has "consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, informants," *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003), and "federal government personnel," *CREW*, 854 F.3d at 682; *accord Blackwell v. FBI*, 646 F.3d 37, 41 (D.C. Cir. 2011) ("As a result of Exemption 7(C), FOIA ordinarily does not require disclosure

of law enforcement documents (or portions thereof) that contain private information.").

The Court now "must balance the [substantial] privacy interests involved against the public interest in disclosure." *SafeCard Servs., Inc.*, 926 F.2d at 1205. Kendrick bears the burden to show a public interest. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). And the "only relevant public interest in the FOIA balancing analysis is the extent to which disclosure . . . would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Elec. Priv. Info. Ctr. v. DOJ*, 18 F.4th 712, 720–21 (D.C. Cir. 2021).

Kendrick suggests no such interest. He says that he requested the records to help him fight his criminal convictions. Pl.'s Opp'n at 9–10. That is indeed a weighty personal interest. But such a "personal stake in the release of the [redacted] information is irrelevant to the balancing" required by 7(C). *Roth*, 642 F.3d at 1177; *see also DOD v. FLRA*, 510 U.S. 487, 496 (1994) ("[E]xcept in certain cases involving claims of privilege, the identity of the requesting party" and his motives simply have "no bearing on the merits" of a FOIA claim.). This is because FOIA mandates disclosure to the public at large, *Stonehill v. IRS*, 558 F.3d 534, 540 (D.C. Cir. 2009), and it draws no "distinctions based on who is requesting the information, for what purpose . . . or what harm the requester might suffer from not getting the information," *Williams & Connolly v. SEC*, 662 F.3d 1240, 1245 (D.C. Cir. 2011). Thus, nondisclosure of the redacted names under Exemption 7(C) "remains justified where, as here, the public interest in disclosure is virtually nonexistent." *Davis v. DOJ*, 968 F.2d 1276, 1282 (D.C. Cir. 1992).

Kendrick makes three other assertions, none persuasive. First, he references "Violent Crime Task Force Reports" that "relate" to his criminal case, Pl.'s Stmt. of Material Facts, ECF No. 38-1 ¶¶ 8–10, "all of which the Government withheld from the Defense in Plaintiff's

criminal case," Pl.'s Reply to Def.'s Counter Stmt. of Material Facts, ECF No. 46 ¶ 9. Perhaps, but the FOIA analysis is separate from discovery in a criminal prosecution. *See Stonehill*, 558 F.3d at 538–39.

Second, Kendrick contends that certain redacted information is in the public domain. *See* Pl.'s Opp'n at 11–15. He argues that because the government released names of individuals in press releases and at his criminal trial, the FBI must therefore disclose their "names and other identifying information." *Id.* True, an agency cannot rely on a FOIA exemption to withhold information if it is in the public domain. *See Davis*, 968 F.2d at 1279. For example, an agency may waive its right to claim an exemption if it officially acknowledges otherwise exempt information in a press release, court document, or at trial. *See Pike v. DOJ*, 306 F. Supp. 3d 400, 410 (D.D.C. 2016); *Callaway v. U.S. Dep't of Treasury*, 824 F. Supp. 3d 153, 164–65 (D.D.C. 2011).

But "[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (emphasis added). And the FOIA requester bears "the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Id*. Typically, a hard copy of the public record "will be the only practicable way for a FOIA requester to demonstrate that the specific information he solicited has indeed circulated into the public domain." *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999).

Kendrick does not carry this burden. He offers a long list of names that allegedly appeared "in the Government's Press Releases[] in relation to Plaintiff's criminal case," plus names of people indicted in his criminal case and testifying witnesses. Pl.'s Opp'n at 12–16. But he does not specify which press release, and he does not show that the release also

10

contained the individuals' "identifying information." *Id.* at 16. Nor does he provide a trial transcript or other court document that contains the allegedly released information.[3] *Compare Bartko v. DOJ*, 167 F. Supp. 3d 55, 71–72 (D.D.C. 2016) (rejecting a plaintiff's assertion of the public domain exception for individuals who testified at trial because he did not provide substantially identical documents containing this information), *with Pike*, 306 F. Supp. 3d at 410–11 (ordering the agency to release documents when a plaintiff submitted press releases and complaints duplicating the withheld information). Merely listing names and referencing press releases is not enough. *Cf. Callaway*, 824 F. Supp. 2d at 165 (collecting cases in which plaintiffs produced excerpts from trial transcripts and other public documents but still did not satisfy the public domain exception). Kendrick thus has not "point[ed] to specific information in the public domain that appears to duplicate that being withheld," as he must to properly invoke the public domain exception. *Wolf*, 473 F.3d at 378.

Nor did the FBI withhold the mere involvement of these individuals with Kendrick's case. The agency's declarant attests that the FBI redacted both names and "other identifying information" which includes, but is not limited to, dates of birth, social security numbers, residences, professional titles, occupations, and driver's license numbers. *See* Seidel Decl. ¶¶ 53 n.12, 55–65. Kendrick offers no reason to think that these pieces of identifying information on these documents are already in the public domain.

Third, Kendrick argues that the FBI improperly withheld five types of records. *See* Pl.'s Opp'n at 4–5 & n.1. These include (1) affidavits supporting search warrants at Kendrick's

---

[3] Kendrick references an "Exhibit E" in his Opposition in support of names he alleges have been released into the public domain. *See* Opp'n at 15. But he included no such exhibit with his Opposition. Indeed, the only Exhibit E on the docket is attached to his Complaint, *see* ECF 1-1 at 9, but it is a letter pertaining to the scope of Kendrick's FOIA request, not a document supporting his arguments about public domain disclosure.

Rochester, New York address; (2) access logs used by federal agents and prosecutors "to retrieve information about an individual they are investigating"; (3) documents pertaining to case dispositions; (4) "no-bills returned by a Federal Grand Jury" in relation to Kendrick; and (5) the VICAP Access Logs that he admits were not "mentioned in this litigation prior to" his opposition. *Id.* at 3–4. Yet again, Kendrick has not identified information in the public domain that duplicates the withheld material. *See ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013). And recall that nondisclosure of the redacted names under Exemption 7(C) "remains justified where, as here, the public interest in disclosure is virtually nonexistent." *Davis*, 968 F.2d at 1282. Kendrick's asserted interests in disclosure are entirely private.

The Court now considers the foreseeable harm requirement. As this Court has noted, fulfilling the terms of exemptions outside Exemption 5 "goes a long way to meeting the foreseeable harm requirement." *Reps. Comm.*, 567 F. Supp. 3d at 127. The FBI meets its burden under the foreseeable harm requirement. It asserts that disclosure of these individuals' names and identifying information would cause invasions of privacy, subject them to harassment, potential reprisal, derogatory inferences, and suspicion. *See* Seidel Decl. ¶¶ 55–65. "These predicted results of disclosure are exactly what Exemption 7(C) seeks to prevent[.]" *Ecological Rts. Found. v. EPA*, 541 F. Supp. 3d 34, 65–66 (D.D.C. 2021). The FBI has thus shown a risk of foreseeable harm from disclosure of this information and has therefore properly invoked Exemption 7(C).

**2.**

Exemption 7(D) shields from disclosure "records or information compiled for law enforcement purposes" that "could reasonably be expected to disclose the identity of a confidential source" and, as applicable here, "information furnished by a confidential source."

5 U.S.C. § 552(b)(7)(D).  Confidential sources include non-federal agencies and private institutions.  *See id*.

The FBI applied this exemption to individuals and non-federal law enforcement personnel who provided information under express or implied assurances of confidentiality.  *See* Seidel Decl. ¶¶ 69–77.  The FBI attests that the individuals conveyed critical information about potential crimes and "were in a position to have ready access to and/or knowledge about investigative targets and their involvement in the multiple crimes" for which Kendrick was convicted.  *Id*. ¶ 70.  If exposed, such individuals could face reprisal including violent threats and physical harm.  *See id*. ¶¶ 70, 72.

Although Kendrick does not challenge this exemption directly, the Court must "determine for itself whether the record and any undisputed material facts justify granting summary judgment."  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016).  The record suffices.

Not "all sources providing information in the course of a criminal investigation do so on a confidential basis."  *Roth*, 642 F.3d at 1184.  So an agency invoking Exemption 7(D) must show that the source acted under an express or implied grant of confidentiality.  The FBI relies on both.  To show that a source received an express assurance of confidentiality, the FBI must present "sufficient evidence that such an assurance was in fact given."  *Id*.  "Such evidence can take a wide variety of forms, including notations on the face of a withheld document[.]"  *Campbell v. DOJ*, 164 F.3d 20, 34 (D.C. Cir. 1998).  Otherwise, the FBI must "point to more narrowly defined characteristics that . . . support the inference" of confidentiality.  *DOJ v. Landano*, 508 U.S. 165, 179 (1993).

As for express confidentiality, the FBI cites pages containing the designation "CI" for

"confidential informants" to argue that this designation "is a positive indication these individuals entered into an official, confidential relationship with the FBI or another law enforcement agency[.]" Seidel Decl. ¶ 77.  Similarly, the FBI cites pages containing "confidential source" designations for local or state law enforcement personnel. *Id*. ¶ 72.

As for implied confidentiality, the FBI points to "its longstanding agreements with [some] agencies that it will protect [them] and their information from disclosure." *Id.* ¶ 73.  And the FBI attests to "more narrowly defined characteristics" supporting an inference of confidentiality.  According to the FBI, sources without express assurances of confidentiality provided information about subjects who were of investigative interest to the FBI. *Id.* ¶ 69.  And the FBI explains that a combination of factors—including the singularity of the information, likelihood the informants could be identified, the proximity of individuals to the investigative subject, and the criminal acts described—caused the FBI to infer that these individuals provided information to the FBI only because they thought it would be held in confidence. *See id.*

The Court applies a four-factor test in assessing implied assurances of confidentiality. *See Roth*, 642 F.3d at 1184.  These include the character of the crime, the source's relation to the crime, whether the source received payment, and whether the source has an ongoing relationship with the law enforcement agency and typically communicates only under conditions which assure confidentiality.  *See id.; see also Marck v. HHS*, 314 F. Supp. 3d 314, 328 (D.D.C. 2018).  The Circuit has also explained that certain information points toward finding an implied grant of confidentiality.  For instance, a cooperating individual supplying "information about a conspiracy to distribute crack and powder cocaine" where "violence and risk of retaliation" are a given, "most assuredly" warrants an implied grant of confidentiality. *Mays v. DEA*, 234 F.3d 1324, 1329 (D.C. Cir. 2000).

14

Here, the character of the crime is indeed severe. Kendrick "was charged as the head of an 18-year Continuing Drug Conspiracy and Continuing Criminal Enterprise (CCE)," and he is serving three life sentences for the CCE and two counts of "Murder While Engaged in a Drug Crime." Pl.'s Opp'n at 10–11. And the FBI attests that the sources for which it claims implied confidentiality have proximity to the investigative subject and events they described. *See* Seidel Decl. ¶ 69. As for the agency contacts, the FBI asserts that it has "long-standing agreements" with these agencies that certain information will be held in confidence. *Id.* ¶ 73.

More, Kendrick's case involves the type of information that the Circuit held sustains an implied grant of confidentiality. *See Mays*, 234 F.3d at 1329. The FBI asserts that disclosure of the informants' identifying information could subject them to "reprisal," "defamation," "violent threats," and even "physical harm or murder." *Id.* ¶ 70. The FBI therefore properly invoked implied confidentiality.

The FBI also carries its foreseeable harm burden. The FBI asserts that it "must honor requests for confidentiality" from the agencies with which it works lest the agency decline to share sensitive information in the future. Seidel Decl. ¶ 74. And the FBI contends that releasing the information it withheld under Exemption 7(D) "could greatly harm the FBI's effectiveness in investigating criminal acts." *Id.* More, the FBI notes the potential for violence against its informants and other risks of reprisal. *See id.* ¶ 70. The Court thus finds that the FBI satisfies its burden to show foreseeable harm, and that it properly invoked Exemption 7(D).

### 3.

Next up is Exemption 7(E), which protects information that would disclose techniques or procedures for law enforcement investigations or prosecutions, as well as guidelines for law enforcement investigations or prosecutions if such disclosure could "reasonably be expected to

15

risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The FBI invokes this exemption to withhold seven categories of information: database identifiers and search results; surveillance information, including targets and dates; data collection and analysis; non-public, internal web addresses; undercover operations; identity and location of an FBI unit; and information about payment to implement particular investigative techniques. *See* Seidel Decl. ¶¶ 49, 80–91.

Under this exemption, the D.C. Circuit has "set a relatively low bar for the agency," requiring it only to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42. Any information that "could increase the risks that a law will be violated" is protected from disclosure. *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).

The FBI has surmounted that bar here. The FBI withheld "non-public investigative techniques and procedures" used "to carry out its law enforcement function" and "non-public details about techniques and procedures that are otherwise known to the public." Seidel Decl. ¶ 79. The Court addresses the specific categories in turn.

*First*, database information. The FBI properly withheld "the identifiers of sensitive investigative [non-public] databases and database search results." Seidel Decl. ¶ 80. It plausibly attests to multiple ways disclosure of such information would aid criminals in acquiring "insight into the available tools and resources the FBI uses to conduct criminal and national security investigations" and jeopardize the FBI's investigative function and effectiveness by, among other concerns, providing "criminals with the opportunity to corrupt or otherwise destroy [stored] information." Seidel Decl. ¶¶ 80–84; *cf. Shapiro v. DOJ*, 393 F. Supp. 3d 111, 122 (D.D.C. 2019) (courts "generally have affirmed the withholding of information related to databases under Exemption 7(E) for risk of cyber-attack or data breach"

16

(cleaned up)).

*Second,* surveillance information. The FBI properly withheld non-public surveillance information "concerning the targets, dates, locations, types of devices, and installation information utilized in surveillance operations" of Kendrick's investigation and current investigations. Seidel Decl. ¶ 85. Recognizing that the use of surveillance is "publicly known," the FBI plausibly explains how "disclosure of [the] non-public details . . . would allow subjects of FBI investigations and others to develop and utilize countermeasures to defeat or avoid different types of surveillance operations, thus rendering the techniques useless to the FBI and other law enforcement agencies." *Id*.; *cf. Blackwell*, 646 F.3d at 42 (finding similar statements sufficient "to justify invocation of Exemption 7(E)").

*Third,* information collection and analysis. The FBI properly withheld "the methods" it "used (and may still use) to collect and analyze information obtained . . . within the context of the investigation" of Kendrick and other subjects engaging in criminal activity. Seidel Decl. ¶ 86. The FBI attests that releasing such information would, among other risks, "enable criminals to educate themselves about the methods employed to collect and analyze information" and "allow them to take countermeasures to circumvent these methods and continue to engage in violations of federal law." *Id*.; *cf. Shapiro*, 893 F.3d at 800 ("We allow the FBI to withhold records under Exemption 7(E) on the basis that releasing them would provide information on how a database is searched, organized and reported." (cleaned up)).

*Fourth*, internal web addresses. The FBI properly redacted "non-public, internal web addresses," which if released would "provide criminals with specific targets for cyber-attacks or other attacks on the FBI's and other law enforcement agencies' secure communications." Seidel Decl. ¶ 87. The FBI attests that, among other risks, "[c]riminals could use this

17

information to gain unauthorized access to the FBI's and other law enforcement agencies' systems and view or manipulate sensitive investigative data, interfere with the FBI's and other law enforcement agencies' nonpublic intranet protocol, or hinder law enforcement's ability to enforce the law by disrupting internal communications." If disclosed, the effectiveness of the agencies' information systems could decrease, enabling "criminals to circumvent the law." *Id.*; *cf. Parker v. ICE*, 238 F. Supp. 3d 89, 100–01 (D.D.C. 2017) (agreeing for similar reasons that disclosing internal website links and other sensitive database information "could reasonably be expected to create a risk of circumvention" of the law).

*Fifth*, undercover information. The FBI properly withheld "non-public details about undercover operations," and plausibly explained why "publicizing details concerning FBI undercover investigative techniques is counterintuitive." *Id.* ¶ 88. Releasing such information would, among other harms, "allow current and future subjects of FBI investigations and other potential criminals to develop and utilize countermeasures and to defeat or avoid undercover operations, thus rendering the technique useless to the FBI and other law enforcement agencies." *Id.*

*Sixth*, the location and identity of an FBI unit. The FBI properly redacted "the location and identity of an FBI unit involved in the investigation of James Dean Kendrick," *id.* ¶ 89, "to prevent criminals from adjusting their behavior and activities to circumvent law enforcement efforts," *id.* ¶ 90. The FBI attests that releasing such information "could reveal additional investigative subjects and non-public, physical areas of interest of the investigation, and, when taken together with other location information" would "establish a pattern or mosaic" that criminals could use to alter their behavior and to avoid detection. *Id.* ¶ 89; *cf. Shapiro*, 393 F. Supp. 3d at 118 (upholding redaction of FBI unit name under Exemption 7(E)).

*Seventh*, information about monetary payments. The FBI properly redacted "the monetary payment amount requested by FBI personnel and paid by the FBI to implement particular investigative techniques employed" in Kendrick's investigation. *Id.* ¶ 91. Disclosing such information "would reveal the FBI's level of focus on certain types of law enforcement or intelligence-gathering efforts" and "give criminals the opportunity to structure their activities in a manner that avoids the FBI's strengths and exploits its weaknesses." *Id.*; *cf. Poitras v. DHS*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (upholding withheld payment information under Exemption 7(E)).

\* \* \*

The proper assertion of 7(E) goes a long way to show the risk of foreseeable harm from disclosure. *See Reps. Comm. v. CBP*, 567 F. Supp. 3d at 127. Indeed, the agency has shown that self-evident risk. Disclosing these seven categories of information would inform criminals about how they may structure their behavior to evade the FBI and deprive it of valuable intelligence. *See* Seidel Decl. ¶¶ 82, 85–91. Indeed, the FBI asserts that disclosure of the withheld information greatly reduces its effectiveness, in some cases rendering the investigative technique "useless." *Id.* ¶¶ 88–91. The FBI has therefore met its burden on foreseeable harm. Kendrick does not dispute the FBI's otherwise proper application of Exemption 7(E). The Court therefore will grant summary judgment to the FBI on its withholdings under this exemption.

**4.**

To properly assert exemptions, the FBI must also "demonstrate that all reasonably segregable material has been released." *Johnson*, 310 F.3d at 776. To meet this burden, the agency can rely on the combination of its declarations and *Vaughn* Index. *See id.* The agency is

also "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). To overcome that presumption, Kendrick must provide a "quantum of evidence." *Id*.

The FBI attests that it reviewed all responsive pages for purposes of segregability and "after extensive review" determined that "no further non-exempt information" could be "reasonably segregated and released without revealing exempt information." Seidel Decl. ¶¶ 93–94. As for the 668 pages it withheld completely, the FBI attests that the information they contain "is either fully covered by one or more of the cited FOIA exemptions" or "is so intertwined with exempt information that no information could be reasonably segregated for release without triggering foreseeable harm to one or more interests protected by the cited FOIA exemptions." *Id*. ¶ 93.

Kendrick counters that the FBI improperly withheld certain Bates-numbered pages because they "qualify as discovery material" that "the Government was obligated to release to [his] Defense Team[.]" Pl.'s Opp'n at 5–6 & n.2. Perhaps, but the *Vaughn* Index confirms the proper withholding of those pages under Exemptions 7(C) and 7(E). Kendrick has presented no evidence to overcome the FBI's representations about segregability. The Court therefore holds that the FBI has fulfilled its segregability obligation.

**IV**.

For these reasons, the Court will grant the FBI's Motion for Summary Judgment and will deny Kendrick's Cross-Motion for Summary Judgment. A separate Order will issue.

Dated: September 28, 2022

_____
TREVOR N. McFADDEN
United States District Judge